DECISION
This is an appeal from a decision of the Zoning Board of Review of the Town of Westerly ("the Board"). The plaintiff, George A. Gingerella, Jr. ("Gingerella" or "the plaintiff") is appealing the Board's October 2, 1991 decision denying his petition for a special exception to construct a telecommunications tower. Jurisdiction in this Court is pursuant to G.L. 1956 § 45-24-69.
Gingerella owns four acres of land located off Old Boom Bridge Road in Westerly, Rhode Island ("the property"). (8/7/91 Tr. at 4.) The property is designated as Assessor's Lot 33B on Plat 11. See Application for Special Exception, dated July 7, 1991 ("Application"). The property is located partially in an R-30 residential zone and partially in an A-l agricultural zone. (8/7/91 Tr. at 5.)
Gingerella entered into a lease agreement with Nynex Mobile Communications ("Nynex"), whereby Nynex agreed to lease a portion of Gingerella's property for the construction and operation of a telecommunications tower and an accompanying shelter. (8/7/91 Tr. at 4, 11, 20.) The proposed height of the tower is between 160 and 180 feet. The surrounding shelter is to be twelve feet by twenty-eight feet in size. (8/7/91 Tr. at 4.)
In his Application, Gingerella requested a special exception to place the tower on the property ". . . under Utility Subsection Provision of the Code of Ordinances of the Town of Westerly." See Application. Pursuant to Article I, § III, "Appendix A — Zoning and Related Matters," of the Westerly Code, which was in effect at the time of Gingerella's application, a "Utility substation" was permitted only by way of a special exception.
On August 7, 1991, the Board held an advertised, public hearing to consider Gingerella's Application. After his attorney, John P. Toscano, Jr. ("Toscano") spoke first, Gingerella then spoke on his own behalf. Thereafter, Gingerella offered the testimonies of Richard Berg ("Berg"), the area manager of real estate for Nynex; Brian E. Powers ("Powers"), a manager of construction and real estate at Nynex; John Williamson ("Williamson"), the manager of radio frequency engineering for Nynex; and Joseph A. Misto, Sr. ("Misto"), the Chief of the Westerly Fire Department.
Gingerella explained the steps and precautions he took and the inquires he made before arriving at his decision to lease his property to Nynex. Gingerella stated that Berg assured him that "there was no problem healthwise with the facility." (8/7/91 Tr. at 12). Gingerella indicated that he went to the Office of Environmental Health Risk Assessment, within the State Department of Health ("Health Department"), the Department of Environmental Management ("DEM"), and the Department of Natural Resources. (8/7/91 Tr. at 12-13.) According to Gingerella, the Health Department maintained that although Rhode Island had no regulations restricting microwave towers or communication facilities, Nynex's other Rhode Island towers "lived well below the guidelines established within Massachusetts." (8/7/91 Tr. at 12.) Gingerella then presented the Board with a copy of a letter from the Health Department, dated July 31, 1991, evidencing this state's lack of microwave radiation regulations and a letter from DEM, dated July 29, 1991, indicating that it was "not aware of any rare plants or animals or ecologically significant natural communities on the site of the proposed facilities." (8/7/91 Tr. at 14-15.) The Board questioned Gingerella about the tower's compliance with O.S.H.A. standards. Gingerella admitted that he had not checked into it himself, but had accepted Berg's statement that Nynex did comply with such regulations. (8/7/91 Tr: at 16.) Gingerella also discussed his concern for the impact of the tower's visibility on the neighborhood. He claimed that the tower would be visible only from limited areas. (8/7/91 Tr. at 17-18.) Gingerella testified that he insisted in his agreement with Nynex that whatever facility Nynex constructed on his property would look comparable to the building already on Gingerella's property and on neighboring properties, that the facility be surrounded by a very high chain-link fence for child-safety reasons, and that the exterior of the fence be surrounded by shrubbery to camouflage the facility itself. (8/7/91 Tr. at 21.) Gingerella later admitted that he had not done even a "quick measurement" to determine how close his surrounding neighbors' homes are to the proposed tower and shelter site. (8/7/91 Tr. at 59.)
Berg testified that the Federal Communications Commission ("FCC") mandates that Nynex provide service to the Westerly area in order for it to maintain its license. (8/7/91 Tr. at 22-23.) Berg further explained Nynex's process of searching for an acceptable Westerly location for its tower and why Gingerella's property was the one Nynex finally chose. Berg also spoke about other already-existing towers Nynex considered renting space on and why negotiations with those potential towers' owners never materialized into any lease agreements. (8/7/91 Tr. at 24-28; 9/5/91 Tr. at 3-8.)
Powers testified as to the process of evaluating the potential construction zone and developing an actual site plan. (8/7/91 Tr. at 30-31.) Powers also presented evidence illustrating the human sight line. (8/7/91 Tr. at 32-33.) Lastly, Powers explained the safety in the design of the tower, indicating that the tower would never tip over, but rather would crumble within itself in the event of any structural damage. (8/7/91 Tr. at 33-37.)
Williamson discussed the types of electronics and other equipment that would be in the shelter and the types of purposes for the antennas that will be used on the tower. (8/7/91 Tr. at 41-44, 55-56.) Williamson also addressed the issues of emissions and propagation of signals of electromagnetic energy through the air. (8/7/91 Tr. at 44.) He reiterated Gingerella's statement that the State of Rhode Island sets no limits on electromagnetic energy propagation, yet continued to illustrate by use of a graph that Nynex operates at levels well below those set by O.S.H.A. and the State of Massachusetts. (8/7/91 Tr. at 44, 46-48.) According to Williamson, before Nynex could build a tower, regardless of zoning approval, it would have to get clearance from the Federal Aviation Administration ("FAA"). (8/7/91 Tr. at 49-50, 95-97.) Williamson indicated that Nynex had already applied to the FAA and was simply waiting for approval. (8/7/91 Tr. at 49-50.)
Misto was the last witness presented by Gingerella. Misto stated that Nynex offered the Westerly Fire Department use of the tower. Misto testified that the fire department would install an antenna that would be approximately 100 feet higher than the one presently used by the department. With the new antenna, Misto explained, the fire department would get better and stronger range. (8/7/91 Tr. at 56-57.)
The Board then invited the audience to speak in favor of or in opposition to Gingerella's petition. Only one Westerly resident spoke in favor of the petition. (8/7/91 Tr. at 57.) Approximately twenty people spoke in opposition to the Application, stating reasons ranging from safety issues, to environmental concerns, to aesthetics. (8/7/91 Tr. at 61-89).
The August 7 hearing was continued to September 5, 1991. At the September 5 hearing, Williamson and Berg spoke again. Most of their testimony was repetitive of that presented at the August 7, 1991 hearing (i.e. microwave emissions and Nynex's efforts to lease space on already-existing towers). Williamson testified that the project had, since the August 7 hearing, received FAA approval. Williamson informed the Board that the FAA required no special lighting or marking on the tower and that the location of the tower was safe in relation to the Westerly airport. (9/5/91 Tr. at 16.) A number of citizens spoke again about the tower's danger, its incompatibility with the surrounding neighborhood and negative impact on wildlife, and its imminent hindrance on the future development of the town. (9/5/91 Tr. at 29-44.) The Board members also discussed among themselves their concerns about the tower's incompatibility with neighboring uses and negative impact on property values. Toward the end of the hearing, Toscano informed the Board that Nynex was "willing to remove the microwave dishes from that tower as a part of the granting of this special exception, so that there should be no concern about health." (9/5/91 Tr. at 53-57.)
The Board closed the hearing on September 5, 1991, but reserved decision until October 2. The Board agreed to visit the subject site prior to the October 2 hearing. At the October 2 meeting, the Board denied Gingerella's Application for a special exception to construct the tower by a four-to-one vote. It found that the proposed tower was not in compliance with Article I, § VI of the Westerly Code, which permits the use upon the petitioner's meeting the requirements for a special exception. The Board determined that the proposed construction is not compatible with neighboring uses, would create a nuisance in the neighborhood, and would hinder the future development of the Town of Westerly. See 10/2/91 Tr. and Art. I, § VI of the Westerly Code, "Special exceptions."
Gingerella filed an appeal to this Court. The Board questions the timeliness of the appeal. On appeal, Gingerella argues that there is no competent legal evidence in the record to support any part of the Board's decision and that "the testimony offered by [Gingerella] was more than sufficient to satisfy all of the criteria provided in the ordinance for establishment of a special exception use." Plaintiffs' Memorandum of Law at 9.
 STANDARD OF REVIEW
The Superior Court review of a zoning board decision is controlled by G.L. 1956 (1991 Reenactment) § 45-24-69 (D), which provides:
 "(D) The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 (1) In violation of constitutional, statutory, or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
When reviewing a decision of a zoning board, a justice of the Superior Court may not substitute his or her judgment for that of the zoning board if he or she conscientiously finds that the board's decision was supported by substantial evidence. Apostolouv. Genovesi, 120 R.I. 501, 507, 388 A.2d 821, 825 (1978). "Substantial evidence as used in this context means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion and means an amount, more than a scintilla but less than a preponderance." Caswell v. George Sherman Sandand Gravel Co. Inc., 424 A.2d 646, 647 (R.I. 1981) (citingApostolou, 120 R.I. at 507, 388 A.2d 824-825). The reviewing court "examines the record below to determine whether competent evidence exists to support the tribunal's findings." New EnglandNaturist Ass'n. Inc. v. George, 648 A.2d 370, 371 (R.I. 1994) (citing Town of Narragansett v. International Association of FireFighters AFL-CIO, Local 1589, 119 R.I. 506, 380 A.2d 521 (1977).
 Law of the Case
The Board argues that this Court should dismiss the instant appeal on the ground that it was not timely filed. However, this issue was previously raised by the Board in its motion to dismiss filed on December 29, 1994. That motion and Gingerella's objection thereto came on for hearing before a justice of the Superior Court on April 17, 1995, at which time it was denied. "[A]fter one judge has decided an interlocutory matter in a pending suit, a second judge on that same court, when confronted at a later stage of the suit with the same question in the identical manner, should refrain from disturbing the first ruling." Richardson v. Smith, 691 A.2d 543, 546 (R.I. 1997).
 Special Exception
The Board's power to grant a special exception or special use permit emanates from § 45-24-57, which provides: "A zoning ordinance adopted pursuant to this chapter shall provide that the zoning board of review shall: (A) Have the following powers and duties: . . . (5) To authorize, upon application, in specific cases, special use permits, pursuant to § 45-24-42 (A) where the zoning board of review is designated as a permit authority for special use permits; . . ."
 Section 45-24-42 provides:
 "45-24-42. General provisions — Special use permits. — A zoning ordinance shall provide for the issuance of special use permits, which shall be approved by the zoning board of review. The ordinance shall:
 (1) Specify the uses requiring special use permits in each district;
 (2) Describe the conditions and procedures under which the special use permits, of each or the various categories of special use permits established in the zoning ordinance may be issued;
 (3) Establish criteria for the issuance of each category of special use permit, that shall be in conformance with the purposes and intent of the comprehensive plan and the zoning ordinance of the city or town;. . . ."
In accordance with § 45-24-42, the Town of Westerly enacted Art. I, § VII of the Westerly Ordinance.[1] Section VII provides:
 "Sec. VI. Special exceptions.
 The zoning board may, in a specific case and after a public hearing, authorize a permit for a use identified in section III and elsewhere in this ordinance as a "special exception." Such proposed use must meet the following requirements:
 (A) It shall be compatible with neighboring uses.
 (B) It will not create a nuisance in the neighborhood.
 (C) It will not hinder the future development of the town . . ."
When a legislative body leaves the determination of whether or not a use should be authorized by the zoning board of review by special exception, "it is a condition precedent to the exercise of the board's jurisdiction that a grant of the use sought must be found by said board as not inimical to the public health, safety, morals and welfare." Id. at 254 (citing Nani v. ZoningBoard of Review of the Town of Smithfield, 242 A.2d 403, 406 (R.I. 1968)).
 Evidence on the Record and Inspection by the Board
Gingerella contends that the Board's decision is not supported by any competent legal evidence in the record. Specifically, Gingerella claims that in deciding that the tower would be incompatible with neighboring uses, "the Board did not explain how a tower would be incompatible with agricultural or conservation and open space uses, and the record is completely barren of evidence to support that conclusion." Plaintiff's Memo. at 6.
Gingerella further argues that the Board's decision that the tower would be a nuisance is an assumption rather than a finding. He alleges that no evidence was presented as to how the tower would be built, how long construction would take, how much noise or traffic construction would generate, or how much of a nuisance the tower's mere existence would be once construction was completed. Plaintiff's Memo. at 7.
Next, Gingerella disputes one of the Board member's finding that the tower posed a danger because of its closeness to the airport. Gingerella contends that the only testimony presented with regard to the tower's questionable close proximity to the airport was the FAA's approval of the tower site. Gingerella further argues that not only was the Board's finding that the tower's location posed a danger to airplanes not supported by competent legal evidence, it was in direct contravention to the FAA's expert opinion.
Finally, Gingerella argues that the Board's finding that the tower's existence would decrease surrounding property values was improperly and insufficiently based solely upon lay testimony presented by townspeople concerned that their property values would plummet. Such on-expert testimony, Gingerella contends, does not amount to competent legal evidence upon which the Board could base its conclusion that the tower would decrease property values, thereby hindering the future development of the town. Plaintiffs Memo. at 8-9.
Regardless of whether the Board erred in finding that the tower would create a nuisance, such finding was not the sole basis for their denial of the Application. Applicants for special exceptions bear the burden of proving that their proposed development complies with all of the requirements in Art. I, § VI. Those include being compatible with neighboring uses and not hindering the future development of the town. (Emphasis added.)
In Klowan v. Zoning Bd. of Review of Town of Cumberland,207 A.2d 42 (R.I. 1965), the zoning board denied the petitioner's application for an exception or variance to conduct a retail ice cream, sandwich, and coffee shop in a building proposed to be constructed on land zoned for residential use. Id. at 42. The relevant Cumberland ordinance provided that the Board could only grant an exception where it found the proposed use or building "(a) to be in harmony with the character of the neighborhood, appropriate to the use or buildings permitted in such district, and possessive of a reasonable tendency towards promoting the public convenience, the public welfare, or the public health; [and] (b) where such use or building is reasonably necessary for the convenience or welfare of the public." Id. at 43. The Court held that the board could deny the special exception based upon its determination that the proposed development would not be in conformity with structures in the neighborhood and would substantially and permanently damage property values in that area. Id. In the instant matter, the Board's determining the subject use's compatibility with the neighboring uses when considering the Application for the special exception was within its ordinance and statutory authority.
The Rhode Island Supreme Court has held that a zoning "board of review is presumed to have a special knowledge of matters that are peculiarly related to the administration of a zoning ordinance and a local conditions as they are affected by the provisions of a zoning ordinance." Kelly v. Zoning Bd. of Reviewof City of Providence, 180 A.2d 319, 322, 94 R.I. 298, 303 (1962) (citing Harrison v. Zoning Bd. of Review, 59 A.2d 361, 364,74 R.I. 135, 141 (1948); Pistachio v. Zoning Bd. of Review,147 A.2d 461, 88 R.I. 285 (1959)). Additionally, "a board of review may properly act . . . on the basis of knowledge that it has acquired through the inspection of the property to which the application refers." Kelly, 180 A.2d at 322, 94 R.I. at 303; see also Coderrev. Zoning Board of Review of the City of Pawtucket, 251 A.2d 397, 400 (R.I. 1969) and Perron v. Zoning Board of Review of the Townof Burrillville, 369 A.2d 638, 642-42 (R.I. 1977) (where the court determined that when a zoning board bases its decision upon its own inspection of the property, it must state, in the decision, what it viewed and what its impressions were). Again, in Charles Land Co. v. Zoning Bd. of Review of the City ofProvidence, 206 A.2d 453 (R.I. 1965), the court upheld the zoning board's denial of petitioner's application for an exception or variance because the record disclosed that prior to the hearing on the application, the board made an inspection of the property and noted its view of the state of the property — "vacant, undeveloped and fill land . . . bounded on the west by a stream. . . ." Id. at 455. The court went on to hold that "[i]t is clear that the board acquired information concerning the effect of the variance sought on the use of the land in question through the inspection that it made and that, on the basis thereof, it formed certain opinions, which this Court has repeatedly held constitute competent evidence upon which a decision of a board may rest when it is disclosed in the record."Id.
In the instant case, no expert testimony was presented concerning the tower's impact or non-impact on property values. It is evidence from the record, however, that all members of the Board visited the proposed tower construction site and the surrounding neighborhood prior to rendering a decision on October 2, 1991. The Board's discussion at the September 5 hearing and its October 2 decision contain detailed reports of its observations. Once board member stated: "I took a careful look up there. I spent considerable time up there yesterday, and it is a beautiful environment up there. . . . There's beautiful woods. The Town woods is up there. They want an open space." (9/5/91 Tr. at 46.) The Board member who made the motion to deny the Application stated: "In my view, the area, which is primarily residential, bordering on an agricultural zone, and in addition is the site of a recent purchase by the Town of woodlands, presumably to ensure the tranquility of the open spaces — the area is primarily served by small country lanes, many of which are unpaved, and in my view this would not be compatible with neighboring uses . . . [future] property values will be affected, and existing property values will most certainly be affected by the presence of this tower." (10/2/91 Tr. at 3-4.) Further findings of the Board included: ". . . there's beautiful country up there, and to have a tower put up of that size, it would be a hindrance to the people that live up in that area, and they would have one bad time really to try to move out of that area once that thing is put up." (10/2/9 1 Tr. at 6.)
It is clear from the record that the Board based its decision on information derived from its view of the property. The chairperson commented: "we reserved the decision until this month to go see the site and digest everything we had given to us." (10/2/91 Tr. at 2.) From its inspection, the Board concluded that the tower would not be compatible with neighboring uses and would cause property values to depreciate, thereby hindering the future development of the town. The Board's findings in support of its denial of the special exception, gleaned from its view of the property, constitute competent evidence. As such, this Court will not substitute its own judgment for that of the Board.
After a review of the entire record, this Court finds that the Board's decision is supported by the reliable, probative, and substantial evidence contained in the record. Substantial rights of the petitioner have not been prejudiced. Accordingly, the Board's October 2, 1991 decision is affirmed.
After proper notice, counsel shall submit the appropriate judgment for entry.
[1] The Westerly Ordinance has been amended since this petition was heard. A "special exception" is now designated a "special use permit" pursuant to § 3.4 (E) of the Westerly Ordinance. The criteria for granting either a special exception or special use permit are the same.